# United States Tax Court

T.C. Memo. 2022-49

MICHAEL J. ROGERSON,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket No. 5848-20.                           Filed May 12, 2022.

————————

Between 2005 and 2013, P was the president and 100% owner of S1, an S corporation engaged (directly or through wholly owned entities) in manufacturing aircraft parts and components (aerospace business). S1 and its wholly owned entities had multiple product lines, some of which involved digital products and some of which involved analog products.

In 2014, P began reorganizing the aerospace business to separate the digital products, analog products, and corporate functions. Following the reorganization, P owned the business directly through three S corporations: S1 (digital products), S2 (analog products), and S3 (corporate functions), each of which filed its own tax return.

In addition to the aerospace business, P owned two yachts that he intended to charter. However, P did not charter the yachts during the years at issue.

Each year, from at least 2005 to 2013, S1 filed Form 1120S, U.S. Income Tax Return for an S Corporation, reflecting all the results of the aerospace business that it and its wholly owned entities conducted. For these years, S1's returns did not separate out the various activities of

**[*2]**  the aerospace business for purposes of the rules under I.R.C. § 469.

On his personal income tax returns for 2005 to 2013, P reported his involvement in S1's overall aerospace business as nonpassive for purposes of I.R.C. § 469.  But on his 2014, 2015, and 2016 tax returns, P reported his involvement in S2 as passive and his involvement in the remaining portion of the aerospace business (in S1 for 2014 and in S1 and S3 for 2015 and 2016) as nonpassive.  He also reported his involvement in his yacht activities as nonpassive for 2014, 2015, and 2016.

R issued a notice of deficiency for tax years 2014, 2015, and 2016, determining among other things that P materially participated in S2 and therefore was required to treat income from S2 as nonpassive for the years at issue.  The notice further determined that P's yacht activities were passive rental activities and that P was liable for accuracy-related penalties under I.R.C. § 6662(a).

P challenges R's notice, arguing among other things that (1) P did not materially participate in S2 during the years at issue, (2) R's reliance on the test for material participation set out in Temp. Treas. Reg. § 1.469-5T(a)(5) is a new matter not pleaded by R, (3) Temp. Treas. Reg. § 1.469-5T(a)(5) is procedurally and substantively invalid, (4) P's yacht activities qualify as nonpassive based on the rental exceptions of Temp. Treas. Reg. § 1.469-1T(e)(3)(ii), and (5) the accuracy-related penalties should not apply because P had reasonable cause and acted in good faith with respect to any underpayment.

*Held*: Under Temp. Treas. Reg. § 1.469-5T(a)(5) and Treas. Reg. § 1.469-5(j)(1), P materially participated in S2 during 2014, 2015, and 2016 because he materially participated in S1's overall business of manufacturing aircraft parts and components for at least five of the ten immediately preceding years.

*Held*, *further*, P's contention that R's reliance on Temp. Treas. Reg. § 1.469-5T(a)(5) is a new matter not pleaded by R is rejected.

**[\*3]**     *Held, further*, P's arguments regarding the substantive validity of Temp. Treas. Reg. § 1.469-5T(a)(5) fail because the regulation is not contrary to I.R.C. § 469.

*Held, further*, we need not address P's argument that Temp. Treas. Reg. § 1.469-5T(a)(5) is procedurally invalid because, even assuming for the sake of argument that P's argument is correct, P would not prevail under the text of I.R.C. § 469.

*Held, further*, P's yacht activities are rental activities that do not qualify for the exceptions described in Temp. Treas. Reg. § 1.469-1T(e)(3)(ii).

*Held, further*, the accuracy-related penalties under I.R.C. § 6662(a) do not apply because P had reasonable cause and acted in good faith with respect to his underpayments of tax.

--------

*Steven R. Mather*, for petitioner.

*Monica D. Polo* and *Samuel M. Warren*, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

TORO, *Judge*:  This deficiency case calls on us to apply the passive activity loss rules of section 469.[1]  Enacted by Congress as part of the Tax Reform Act of 1986, Pub. L. No. 99-514, § 501(a), 100 Stat. 2085, 2233, the rules limit a taxpayer's use of losses generated by passive activities to offset unrelated income generated by nonpassive activities.

Petitioner Michael Rogerson is a successful entrepreneur. A patent holder and certified commercial pilot, Mr. Rogerson has owned and led an eponymous group of companies in the aerospace industry

--------

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

[*4] since the late 1970s. Also a sailing and boating enthusiast, during the tax years 2014, 2015, and 2016, Mr. Rogerson owned two yachts that he intended to charter.

The issues for our decision relate to the federal income tax consequences of Mr. Rogerson's participation in these two endeavors. Specifically, we must decide three questions: (1) whether, for the tax years 2014, 2015, and 2016, Mr. Rogerson materially participated in certain of his aerospace activities, with the result that income from those activities must be treated as nonpassive (we conclude he did); (2) whether Mr. Rogerson's yacht activities during the same years were per se passive as rental activities (we conclude they were); and (3) whether Mr. Rogerson is liable for accuracy-related penalties on the underpayments of tax resulting from our first two holdings (we conclude he is not).

As we explain in greater detail below, in light of the answers to the first two questions, Mr. Rogerson may not offset losses resulting from his passive yacht activities against income from his nonpassive aerospace activities. He is not liable for the accuracy-related penalties the Commissioner determined, however, because Mr. Rogerson had reasonable cause and relied in good faith on his certified public accountant in connection with the preparation of the returns at issue.

FINDINGS OF FACT

The parties have filed First and Second Stipulations of Fact, both with attached exhibits, and a Stipulation of Settled Issues, all of which are incorporated by this reference. Trial of this case was held remotely on May 5 and 6, 2021. Mr. Rogerson resided in Nevada when he filed his petition.

I.    *Aerospace Activities*

A.    *Establishment of the Rogerson Companies*

In the late 1970s, Mr. Rogerson had a summer job in the aerospace industry. When an acquaintance called to ask for help finding a new part, Mr. Rogerson decided that he would build the part himself. He engaged an engineer to design the part and a manufacturer to build it, and soon established his first company: Rogerson Aircraft Controls, Inc. The company manufactured electromechanical products and eventually changed its name to Rogerson Aircraft Corporation (RAC), which still operates today.

**[*5]**  Over the next 40 years, Mr. Rogerson grew his business by acquiring and developing new product lines, all of which were held directly or indirectly by RAC.  Business operations were located in California, in Irvine and Pasadena.  Mr. Rogerson served as the chief executive officer of RAC and its subsidiaries at all times, personally held patents used in certain product lines, and obtained his commercial pilot's license to better understand the industry.  By the end of 2013, the Rogerson companies included the following units, which Mr. Rogerson referred to as "brands":

| Name of Unit | Product Line | Location of Operations | Product Type | Owned Since at Least 2005? |
|---|---|---|---|---|
| Rogerson Aircraft Controls (Controls) | Controls systems | Irvine | Analog | Yes |
| Rogerson Aircraft Systems (Systems) | Lavatory systems | Irvine | Analog | Yes |
| Rogerson ATS | Auxiliary fuel systems | Irvine | Analog | Yes |
| Kratos Pressure Products (Pressure) | Pressure gauges | Irvine | Analog | Yes |
| Kratos Instruments | Analog instruments | Pasadena | Analog | Yes |
| Rogerson Kratos | Digital flat panel displays | Pasadena | Digital | Yes |
| InTheAirNet (ITAN) | Passenger entertainment systems | Irvine | Digital | Yes |

> B.    *2014 Reorganization*

By 2014, Mr. Rogerson was making an effort to separate the Rogerson companies' product lines based on whether they included legacy analog products or contemporary digital products.  With the exception of analog instruments made by Kratos Instruments, the analog product lines were located together at RAC's facilities in Irvine.

[*6] During 2014, Mr. Rogerson gave further consideration to the organization of the Rogerson companies. In his view, the digital products of Rogerson Kratos were different from the analog products made by Kratos Instruments. Additionally, Mr. Rogerson had spoken with attorneys about estate planning and thought that "there was really no way the businesses would keep operating . . . after [his] demise." Accordingly, Mr. Rogerson wanted to reorganize the Rogerson companies.

In 2014, Mr. Rogerson decided that Kratos Instruments' operations should be moved from Pasadena to Irvine. He further decided to reorganize the Rogerson companies' legal structure: While all product lines had previously been owned directly or indirectly by RAC, Mr. Rogerson determined that the digital and the analog product lines would be divided and held (directly or indirectly) by two separate legal entities, each of which Mr. Rogerson would own directly.

Mr. Rogerson's plans were implemented in 2014 and 2015. First, RAC transferred all its interests in the analog product lines (including interests in legal entities that manufactured analog products) to Rogerson ATS, a corporation wholly owned by RAC, effective January 1, 2014.[2] RAC then transferred 100% of the stock of Rogerson ATS to Mr. Rogerson, also effective January 1, 2014. Kratos Instruments' employees, inventory, and equipment were physically moved from Pasadena to Irvine during the second half of 2014, and the move was nearly complete by January 2015. Rogerson ATS changed its name to Rogerson Aircraft Equipment Group (RAEG), effective November 5, 2014. Finally, effective January 1, 2015, RAC transferred to Mr. Rogerson 100% of the stock of Rogerson Corporation (RC), a management company that provided services to the other Rogerson companies.[3]

After the 2014 reorganization was completed, Mr. Rogerson held his aerospace business through three corporations: RAC, RAEG, and RC. RAC (directly or indirectly) owned Rogerson Kratos and ITAN and was primarily engaged in manufacturing and selling digital products.

---

[2] Rogerson ATS's own business making auxiliary fuel systems had dwindled to almost nothing by the time of the transfer, because newer aircraft generally do not require such systems.

[3] RC changed its name to Rogerson Capital in 2016. Additionally, certain steps of the reorganization not relevant to our analysis have been omitted from the summary above.

[*7] RAEG (directly or indirectly) owned Controls, Systems, Pressure, and Kratos Instruments and was engaged in manufacturing and selling analog products.[4] RC employed the executive team and provided finance, legal, human resources, sales, and other support to RAC and RAEG.

### C.  *Management of RAEG*

Before and after the 2014 reorganization, the operations of RAEG's business units remained generally the same. With the exception of the physical relocation of Kratos Instruments to Irvine, the units manufactured the same products in the same locations and sold those products to the same customers. Indeed, at least some major customers were unaware of the reorganization as late as 2016. A small number of employees who declined to move with Kratos Instruments to Irvine were terminated, but otherwise staffing generally remained the same. And Mr. Rogerson continued to oversee the business as a whole.

Mr. Rogerson remained the CEO of RAC, RAEG, and RC from the time of their incorporation through the years at issue. While other company employees, including a small number of executives, ran the day-to-day operations of each corporation, Mr. Rogerson was actively engaged with them all, including RAEG, in particular by monitoring operations and production, communicating with management on employment issues, and taking a hands-on approach to sales and customer relations.

With respect to RAEG specifically, Mr. Rogerson received regular reports on the company's results, attended meetings to discuss the results, and took action when they fell below expectations.[5] He ordered the Kratos Instruments move from Pasadena to Irvine and oversaw its progress, including setting the timeline, making decisions with respect to staffing matters, and deciding on the wording of materials explaining the move to employees and customers. As one company executive put it

---

[4] The parties stipulated that RAEG reported ITAN's activity on its tax returns during the years at issue, but other evidence confirms that ITAN was owned by RAC rather than RAEG for 2014, 2015, and 2016. We are not obliged to accept a stipulation between the parties when it is clearly contrary to facts disclosed by the record. *Cal-Maine Foods, Inc. v. Commissioner*, 93 T.C. 181, 195 (1989). And, in any event, the question of ITAN's ownership is not dispositive to the outcome of this case.

[5] On more than one occasion during the years at issue, RAEG executives stated that Mr. Rogerson's direct involvement, whether in the form of "ongoing and specific directives," "edict[s]," or other directions, would be required to complete an initiative.

**[*8]** when discussing the phrasing of an employee offer letter: "Michael gets the last word." Mr. Rogerson directed executives as to which engineers within the Rogerson companies could work on Kratos Instruments projects. He approved capital expenditures and provided input on accounting issues. He also was involved in the refurbishment of the Irvine facilities to accommodate the Kratos Instruments move.

On employment matters, Mr. Rogerson hired and fired executives, set department budgets, and weighed in on staffing at all levels of the company. During the years at issue, he was asked to approve all bonuses and even an hourly rate increase of $0.50. Generally, not even the president of RAEG was authorized to increase salaries or provide bonuses to RAEG employees—those decisions were made by Mr. Rogerson.

Consistent with his authority over staffing matters, Mr. Rogerson knew employees by their first names, communicated with them directly, and weighed in on how and when they should be replaced. When one employee was out on medical leave, Mr. Rogerson directed that his replacement should be hired from outside the company rather than promoted from within, citing "mid management depth" that was "too thin." Mr. Rogerson alerted executives when he felt certain employees were not pulling their weight, noting in one instance that an engineer "did not carry his own load during the [Kratos Instruments] move" and that Mr. Rogerson "[did not] see rewarding him by having [another engineer] doing his job now."

During this period, Mr. Rogerson was perhaps most extensively involved in sales and customer relations. On multiple occasions, he personally met with RAEG customers and potential customers and participated in customer negotiations. He traveled to visit customers, including internationally, and also hosted customers at RAEG's offices.[6] He drafted press releases, received reports on customer visits that he did not attend, and got personally involved when disputes with customers arose. More than once, Mr. Rogerson told RAEG executives that he would resolve a problem by meeting personally with the customer involved. And customers sometimes reached out directly to Mr. Rogerson with complaints. His approval was required for any bid

---

[6] At least one trip during the years at issue was to an RAEG customer in Indonesia.

**[*9]** provided to a customer with an aggregate value over $100,000; in one month in 2016, that approval was requested at least a dozen times.

As part of his activities, Mr. Rogerson discussed RAEG with company executives, both in person and on the phone. During the years at issue, he communicated with RC and RAEG executives regarding RAEG's finances, its operations, the Kratos Instruments move, and the potential sale of the company. The RAEG president and the Rogerson companies' chief financial officer, together or separately, spent at least 10 to 15 hours per month with Mr. Rogerson on RAEG financial and operational matters. Mr. Rogerson also communicated with those individuals and others via email, including on weekends and holidays.

In short, Mr. Rogerson was an actively engaged CEO throughout the years at issue. And his level of involvement in RAEG in particular and in the Rogerson companies more generally during those years was substantially the same as it was during the years preceding the 2014 reorganization.

## II.  *Mr. Rogerson's Yachts*

In addition to being interested in aviation, Mr. Rogerson was a sailing enthusiast from an early age. He eventually developed an interest in powerboats, and during the years at issue he owned two yachts—the *TOTO* and the *Falcon Lair*—that he intended to make available for charter.

### A.  *The* TOTO

Mr. Rogerson purchased the *TOTO*, a 1983 Palmer Johnson 110-foot cutter, in or around 1999.[7] In 2014, 2015, and 2016, Mr. Rogerson kept the *TOTO* at a marina in Fort Lauderdale, Florida. Insurance policies that covered the *TOTO* for the period May 22, 2015, to May 22, 2017, permitted charters for a maximum of 12 weeks each year.[8] The *TOTO* was not commercially registered from 2014 to 2016 and was not available for charter during those years.

---

[7] Mr. Rogerson owned the *TOTO* through a limited liability company named Toto, LLC.

[8] The policies defined a charter agreement as a "written contract between the owner of the insured yacht and the charterer in which the insured yacht is rented for one or more voyages or a fixed period of time."

**[\*10]** The *TOTO* was managed by a four-person crew, including a captain, a deckhand, a stewardess, and an individual that would help with the engine room and serve as a deckhand when needed. Because the *TOTO* was not chartered, the crew did not provide services to any customers during 2014, 2015, and 2016. For at least a portion of those years, the *TOTO* was in a shipyard for repairs.

B.     *The* Falcon Lair

In 2014, Mr. Rogerson purchased the *Falcon Lair*, a 225-foot vessel built in 1983.[9] The yacht underwent a major refit during 2014 and early 2015 before being relaunched during the summer of 2015. During 2014, 2015, and 2016, the *Falcon Lair* was held at various marinas in Europe. Insurance policies covering the *Falcon Lair* for the periods May 27, 2014, to May 27, 2015, and July 15, 2016, to July 14, 2017, prohibited charters unless approved by the insurer in advance in writing, or else prohibited charters outright.[10]

Like the *TOTO*, the *Falcon Lair* was not commercially registered during 2014, 2015, and 2016, nor was it chartered. Nevertheless, Mr. Rogerson engaged a management company to manage the *Falcon Lair*. The management company was responsible for arranging the *Falcon Lair*'s trips from harbor to harbor, including by provisioning the yacht with fuel and food.

The *Falcon Lair* initially was operated by a 12-person crew, but that number dropped to 8 or 9 while the yacht was in the shipyard for refurbishment. Because the *Falcon Lair* was not chartered, the crew did not provide services to any customers during 2014, 2015, and 2016. When the *Falcon Lair* was not in the shipyard for repairs or

---

[9] Mr. Rogerson established two limited liability companies to manage and hold the *Falcon Lair*: Platinum Marine Ventures, LLC (Platinum), and Sterling Marine Ventures, LLC (Sterling). Platinum generally paid the *Falcon Lair*'s operating expenses, including the costs of crew, fuel, and guests. Sterling held legal title to the *Falcon Lair* and paid expenses associated with insurance, depreciation, and freight fees, among others.

[10] One policy, for example, stated that the *Falcon Lair*'s "use" was "Private Pleasure and / or Corporate Entertaining" and that the yacht was "Warranted to be used solely for private pleasure purposes and not to be hired or chartered unless approved and permission endorsed hereon." The record does not reflect any such endorsement.

**[*11]** refurbishment, Mr. Rogerson and his family sometimes used the yacht for personal trips.

III. *Tax Reporting*

A. *Tax Preparation*

From 2002 through the years at issue, Mr. Rogerson's personal income tax returns and the tax returns of the Rogerson companies were prepared by Tony Chang, a certified public accountant and tax professional.

Mr. Chang worked for one major accounting firm from 1994 to 1996 and for a second major accounting firm from 1996 to 2002. He then opened his own boutique practice with a partner. Mr. Rogerson and his companies had been clients of the second major accounting firm and continued to use Mr. Chang and his partner after they opened their boutique practice.

By 2014, Mr. Chang had been preparing Mr. Rogerson's personal income tax returns and the tax returns of the Rogerson companies for at least 12 years. He was familiar with the various entities in the corporate structure and the mechanics of the 2014 reorganization. He also was familiar with Mr. Rogerson's yacht activities. For each year from 2014 to 2016, Mr. Chang considered the application of the passive loss rules to Mr. Rogerson's activities and provided advice to Mr. Rogerson about how the activities should be reported on his personal income tax returns. As part of Mr. Chang's analysis, he collected information from Mr. Rogerson and other executives at the Rogerson companies, generally by having informal discussions with those individuals rather than requesting documentation. For each of the years at issue, Mr. Rogerson reported his activities consistent with Mr. Chang's advice.

B. *Aerospace Activities*

From at least 2005 to 2013, RAC filed Form 1120S, U.S. Income Tax Return for an S Corporation, reflecting all the results of Mr. Rogerson's aerospace business. For these years, no effort was made on the RAC returns to separate out the various activities of the Rogerson companies for purposes of the passive activity loss rules of section 469. In his personal income tax returns, Mr. Rogerson reported his involvement in RAC's combined activity as nonpassive.

**[\*12]** Starting in 2014, RAC and RAEG each filed separate Forms 1120S. In his personal income tax returns for 2014, 2015, and 2016, Mr. Rogerson reported his involvement in RAC as nonpassive and his involvement in RAEG as passive. Based on Schedules K-1, Shareholder's Share of Income, Deductions, Credits, etc., issued by RAC, Mr. Rogerson reported a loss of $3,926,922 for 2014, income of $163,814 for 2015, and a loss of $2,855,771 for 2016. For the same years, he reported income of $7,093,760, $3,238,454, and $4,762,543 based on Schedules K-1 issued to him by RAEG.

RC filed a separate Form 1120S starting in 2015, and Mr. Rogerson reported his involvement in RC as nonpassive. For the taxable years 2015 and 2016, Mr. Rogerson reported ordinary income of $391,615 and $380,027, respectively, based on Schedules K-1 issued by RC.

### C. *Yacht Activities*

In his 2014 personal income tax return, Mr. Rogerson sought to apply a passive loss carryforward of $3,409,986 related to his pre-2014 *TOTO* activity to offset the passive income that he reported from RAEG.[11] For 2014, 2015, and 2016, however, Mr. Rogerson reported his involvement in both the *TOTO* and the *Falcon Lair* as nonpassive. With respect to the *TOTO*, Mr. Rogerson claimed losses of $1,110,387, $583,165, and $818,841 in 2014, 2015, and 2016, respectively. With respect to the *Falcon Lair*, he claimed losses of $2,009,554, $4,993,719, and $5,028,440 during the same years.[12]

### IV. *Examination and Notice of Deficiency*

Revenue Agent Amanda Dougherty conducted an examination of Mr. Rogerson's tax returns for 2014, 2015 and 2016.[13] As part of the examination, Ms. Dougherty considered whether Mr. Rogerson properly characterized his aerospace and yacht activities as passive and nonpassive and ultimately determined that he did not.

---

[11] The parties have since stipulated that the correct amount of the carryover is $3,382,990.

[12] The total loss for the tax year 2015 shown above is net of $147,050 of income related to the *Falcon Lair*. That income arose from the favorable resolution of a lawsuit.

[13] At the time of the examination, Ms. Dougherty's name was Amanda Davis.

**[\*13]** Near the conclusion of the examination, Ms. Dougherty mailed Mr. Rogerson a Letter 5153, dated March 20, 2018, with an attached examination report proposing, among other adjustments, an accuracy-related penalty under section 6662(a) for each tax year at issue. The letter was the first written communication sent to Mr. Rogerson regarding the penalties under section 6662(a) and was mailed before Ms. Dougherty had secured supervisory approval of the penalty assertion from her supervisor, Acting Group Manager Mayank Patel. When Mr. Rogerson failed to respond to the letter, Mr. Patel sent to Mr. Rogerson a signed "30-day letter" (Letter 950) on April 11, 2018, which again asserted the penalties under section 6662(a) and offered Mr. Rogerson the option to appeal. Additionally, on April 5, 2018, Ms. Dougherty prepared Form 300, Civil Penalty Approval Form. Mr. Patel signed the Civil Penalty Approval Form on June 25, 2018.

Mr. Rogerson appealed his case to the Internal Revenue Service Office of Appeals (IRS Appeals),[14] but was unable to reach a resolution with that office. On March 17, 2020, the Commissioner issued to Mr. Rogerson a notice of deficiency that recharacterized his activity with respect to RAEG as nonpassive and with respect to the yachts as passive.[15] Regarding RAEG, the notice stated, among other things, that Mr. Rogerson "materially participated in RAEG" and therefore that "the income should be treated as non-passive income." The notice determined deficiencies in Mr. Rogerson's federal income tax of $2,136,552, $1,884,960, and $1,558,158, plus accuracy-related penalties of $427,310, $376,992, and $311,632, for 2014, 2015, and 2016, respectively. Mr. Rogerson timely petitioned the Court seeking a redetermination of the deficiencies and penalties.

---

[14] On July 1, 2019, the Office of Appeals was renamed the Independent Office of Appeals. *See* Taxpayer First Act, Pub. L. No. 116-25, § 1001, 133 Stat. 981, 983 (2019). We will use the name in effect at the times relevant to this case, i.e., the Office of Appeals.

[15] With respect to the yachts, the notice elaborated that "Appeals previously determined that a similar activity . . . was a valid rental activity despite the extremely limited rental income generated; therefore, [Revenue Agent Dougherty] in being consistent with the prior Appeals ruling has allowed the activity to remain but limited the Passive Losses to the passive income available."

**[*14]**                                    OPINION

I.    *Burden of Proof*

In general, the Commissioner's determinations set forth in a notice of deficiency are presumed to be correct, and the taxpayer bears the burden of showing that those determinations are in error.  Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933).  But the Commissioner bears the burden of proof with respect to any "new matter" he raises.  *See* Rule 142(a).  Where relevant, we discuss burden of proof in the individual issue sections below.[16]

II.   *Section 469 Issues*

Individual taxpayers may generally deduct, under sections 162 and 212 respectively, ordinary and necessary expenses paid or incurred in carrying on a trade or business or for the production of income.  But the Code disallows any current deduction for a "passive activity" loss.  I.R.C. § 469(a)(1), (b).  A passive activity loss is the amount (if any) by which the aggregate losses from the taxpayer's passive activities for a taxable year exceed the aggregate income from passive activities for that year.  I.R.C. § 469(d)(1).  Thus, under the Code, passive losses cannot be used to offset income from nonpassive activities.  *See Beecher v. Commissioner*, 481 F.3d 717, 721 (9th Cir. 2007), *aff'g Cal Interiors Inc. v. Commissioner*, T.C. Memo. 2004-99.  A disallowed passive activity loss is not lost; rather, it is deferred or suspended and remains available as a deduction against future passive income.  I.R.C. § 469(b).

In light of these rules, a great deal turns on whether an activity is passive or nonpassive under section 469.  We therefore provide a brief discussion of how one makes that determination and then apply the relevant principles to Mr. Rogerson's case.

A.    *Passive Activities*

A passive activity generally is an activity involving the conduct of a trade or business in which the taxpayer does not materially

---

[16] Generally speaking, a burden of proof analysis is required only in the rare instance of an evidentiary tie.  *See, e.g.*, *Knudsen v. Commissioner*, 131 T.C. 185, 189 (2008), *supplementing* T.C. Memo. 2007-340; *see also FRGC Inv., LLC v. Commissioner*, 89 F. App'x 656 (9th Cir. 2004), *aff'g* T.C. Memo. 2002-276.  As we discuss further below, we resolve this case on the preponderance of the evidence, and therefore Mr. Rogerson's arguments regarding the burden of proof are unavailing.  *See, e.g.*, *Dagres v. Commissioner*, 136 T.C. 263, 279 (2011).

**[*15]** participate. I.R.C. § 469(c)(1). Moreover, subject to certain exceptions not relevant here, rental activities are passive regardless of whether the taxpayer materially participates. *See* I.R.C. § 469(c)(2), (4), (7).

### B. *Material Participation*

A taxpayer's participation in an activity is "material" only if his involvement in the operations of the activity is regular, continuous, and substantial. I.R.C. § 469(h)(1). Temporary regulations first issued in 1988 provide seven tests for determining when this standard is satisfied. *See* Temp. Treas. Reg. § 1.469-5T(a) (stating that an individual will be treated as materially participating in an activity "if and only if" one of the seven tests is satisfied). Because, as explained below, we can resolve Mr. Rogerson's case based on one of the regulatory tests (the "five of ten" test), we do not discuss the remaining ones.

#### 1. *The Five of Ten Test*

For purposes of section 469(h)(1), a taxpayer is treated as materially participating in an activity if he materially participated in the activity for any five out of the ten years immediately preceding the taxable year. Temp. Treas. Reg. § 1.469-5T(a)(5). The preamble to the temporary regulations adopting the test explained its purpose as follows:

> These rules are included because the Service believes that an activity in which an individual has materially participated over a long period of time . . . is likely to represent the individual's principal livelihood rather than a passive investment. In particular, the Service does not believe that withdrawal from a longstanding active business . . . should convert an individual's earnings from the business to passive income.

T.D. 8175, 1988-1 C.B. 191, 203.

By its terms, the five of ten test applies to an activity that is the same over time. But the regulations also explain how to apply the test when a taxpayer's activities change over time. In these circumstances, final regulations call for a comparison of the taxpayer's current-year activities with his preceding-year activities. Specifically, Treasury Regulation § 1.469-5(j)(1) provides as follows:

**[\*16]** For purposes of [the five of ten test], a taxpayer has materially participated in an activity for a preceding taxable year if the activity includes significant section 469 activities[17] that are substantially the same as significant section 469 activities that were included in an activity in which the taxpayer materially participated (determined without regard to [the five of ten test]) for the preceding taxable year.

In other words, if there is substantial similarity between the current-year activity and activities that the taxpayer materially participated in during a preceding year, then that preceding year counts as one year in applying the five of ten test to the current-year activity. *See id.* If there is substantial similarity between the current-year activity and activities that the taxpayer materially participated in for five of the last ten years, then the five of ten test is satisfied and the taxpayer is treated as materially participating in the current-year activity for the current year. *See id.*; Temp. Treas. Reg. § 1.469-5T(a)(5).

The history of Treasury Regulation § 1.469-5(j)(1) confirms this interpretation. When temporary regulations first established the five of ten test in 1988, they did not initially address how the test should apply to a situation in which an individual's business activities evolve during the ten-year period. *See* T.D. 8175, 1988-1 C.B. at 203; *see also* T.D. 8253, 1989-1 C.B. 121, 122 (noting the omission). In 1989, however, the Department of the Treasury (Treasury) and the IRS[18] issued additional temporary regulations under section 469 (1989 amendments). The 1989 amendments added Temporary Treasury Regulation § 1.469-4T to define the concept of an "activity" for purposes of section 469. *See* T.D. 8253, 1989-1 C.B. at 122–23. The definition included the concept of an "undertaking," which was the smallest unit that could constitute an activity. *Id* at 122.

As relevant here, the 1989 amendments also made certain changes to Temporary Treasury Regulation § 1.469-5T, including adding paragraph (j)(1), T.D. 8253, 1989-1 C.B. at 158, the precursor to Treasury Regulation § 1.469-5(j)(1). The preamble to the 1989 amendments explained the new rule as follows:

---

[17] We explain further below the origin and meaning of the phrase "significant section 469 activities."

[18] For simplicity, we refer to both Treasury and the IRS as "Treasury."

**[\*17]**      Under § 1.469-4T, the business and rental operations that constitute an activity may change from year to year. The existing regulations do not address how the material participation tests that are based on participation in prior years will apply in cases in which such changes occur. Accordingly, this document amends § 1.469-5T to provide that, for purposes of the material participation tests that are based on participation in prior years, a taxpayer is treated as materially participating in an activity for a prior taxable year if the activity includes an undertaking involving substantially the same operations as an undertaking that was included in an activity in which the taxpayer materially participated during such prior taxable year.

T.D. 8253, 1989-1 C.B. at 126. The text of the temporary rule tracked the preamble's explanation:

For purposes of [the five of ten test], a taxpayer has materially participated in an activity for a preceding taxable year if such activity includes an undertaking that involves substantially the same business and rental operations as an undertaking that was included in an activity in which the taxpayer materially participated . . . for such preceding taxable year.

Temp. Treas. Reg. § 1.469-5T(j)(1), T.D. 8253, 1989-1 C.B. at 158. Like the current rule, therefore, the rule issued as part of the 1989 amendments required a comparison of the taxpayer's current-year activity to his preceding-year activity. If the activities were sufficiently similar—i.e., if they included undertakings that involved similar business operations—and if the taxpayer materially participated in the preceding-year activity, then the taxpayer would also be treated as materially participating in the current-year activity during the preceding year. *See id.*

By 1992, Treasury determined that the 1989 definition of activity, including the concept of undertaking, was too complicated and mechanical and that a more flexible approach was required. *See* Limitation on Passive Activity Losses and Credits—Definition of Activity, 57 Fed. Reg. 20,802, 20,803 (proposed May 15, 1992). As a result, Treasury issued Proposed Treasury Regulation § 1.469-4, 57 Fed. Reg. at 20,804, to replace Temporary Treasury Regulation § 1.469-4T.

**[\*18]** Simultaneously, Treasury finalized other parts of the 1989 amendments, including the clarification of the five of ten test that previously appeared at Temporary Treasury Regulation § 1.469-5T(j)(1). T.D. 8417, 1992-1 C.B. 173, 186.[19] Treasury did not, however, finalize the original temporary regulations—i.e., rules that were issued in 1988 and not amended in 1989. Those regulations, which include the seven regulatory tests for determining material participation and certain related rules, continued in their temporary form. Thus, today, the five of ten test appears in a temporary regulation, while the rule explaining how the five of ten test should be applied appears in a final regulation.

When it was finalized in 1992, the rule explaining how the five of ten test should be applied was modified slightly to its current form, essentially replacing the concept of an "undertaking" with that of a "significant section 469 activit[y]." *See* Treas. Reg. § 1.469-5(j)(1). In describing the change, Treasury stated:

> The final regulations generally adopt the amendments as originally proposed. They only make certain minor technical modifications to the amendments, including changes that conform them to the proposed regulations under § 1.469-4, relating to the definition of activity.

T.D. 8417, 1992-1 C.B. at 174.

Thus, the differences between the explanatory rule as originally proposed at Temporary Treasury Regulation § 1.469-5T(j)(1) and the final rule at Treasury Regulation § 1.469-5(j)(1) were not intended to be significant. And while the final rule's phrasing is somewhat convoluted, the text and regulatory history leave us with no doubt regarding its meaning. Specifically, the rule provides that even if a taxpayer's mix of activity changes over time, the taxpayer is treated as materially participating in a current-year activity if that activity substantially overlaps with activities that the taxpayer materially participated in for

---

[19] Treasury finalized the 1989 amendments to avoid potential disputes about whether they would expire under section 7805(e)(2), which provides that all temporary regulations expire three years after the date they are issued. *See* T.D. 8417, 1992-1 C.B. at 174. Section 7805(e)(2) was enacted in 1988 and applies only to temporary regulations issued after November 20, 1988. *See* Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100-647, § 6232, 102 Stat. 3342, 3734. Accordingly, section 7805(e)(2) potentially applied to the 1989 amendments, but not to the original temporary regulations. *See* T.D. 8175, 1988-1 C.B. at 233–34.

**[\*19]** five of the last ten years. *See* Treas. Reg. § 1.469-5(j)(1); Temp. Treas. Reg. §. 1.469-5T(a)(5). As one commentator put it, "any significant overlap between activities for different tax years causes them to be treated as the same activity for purposes of the 5-out-of-10-years test." Libin Zhang, Passive Loss Rules, 549-3rd Tax Mgmt. (BNA), at IV.A.5.

### 2. *Application to Mr. Rogerson and RAEG*

In this case, we apply the material participation rules, and the five of ten test in particular, to determine whether Mr. Rogerson's involvement in RAEG was passive or nonpassive during 2014, 2015, and 2016. The Commissioner contends that Mr. Rogerson's involvement was nonpassive because Mr. Rogerson has failed to carry his burden to establish that he did not materially participate in RAEG. Additionally, the Commissioner argues that Mr. Rogerson satisfies the five of ten test for material participation.[20] For the reasons described below, we agree that Mr. Rogerson materially participated in RAEG under the five of ten test, and therefore that his involvement in the activity must be treated as nonpassive.

Applying the five of ten test to RAEG for the tax years 2014, 2015, and 2016 requires us to examine Mr. Rogerson's pre-2014 involvement in the activities that ultimately constituted RAEG. *See* Temp. Treas. Reg. § 1.469-5T(a)(5). Moreover, given that the organization of Mr. Rogerson's activities changed during the relevant years (e.g., because of the 2014 reorganization), Treasury Regulation § 1.469-5(j)(1) informs our analysis.

Turning first to Mr. Rogerson's tax reporting, we have found at his request that all the results of his aerospace business, including the RAEG-related activity, were reported on RAC's income tax returns from 2005 to 2013. We have further found, again at Mr. Rogerson's request, that no effort was made during these years to separate the various activities of the Rogerson companies for purposes of the passive activity loss rules. In other words, RAC treated the aerospace business, including the activities that became part of RAEG, as a single, undifferentiated activity on its tax returns and when it issued Schedules K-1 to Mr. Rogerson. Mr. Rogerson reported his involvement in this

---

[20] The Commissioner makes certain other arguments based on the amount of time Mr. Rogerson spent on RAEG during 2014, 2015, and 2016, but in light of our analysis under the five of ten test, we need not reach those arguments.

**[*20]** consolidated activity as nonpassive on his personal income tax returns and similarly did not attempt to separate the activities. *Cf.* Treas. Reg. § 1.469-4(d)(5)(i) (providing that a shareholder of an S corporation may not treat activities grouped together by his corporation as separate activities). According to his own tax returns, therefore, Mr. Rogerson maintained that he materially participated in his aerospace business as a whole from at least 2005 to 2013.

Mr. Rogerson does not seem to dispute that his involvement in the overall business was nonpassive during those years; indeed, he maintains that Rogerson Kratos, which also was part of the aerospace business from 2005 to 2013, required large amounts of his time, and that he was involved with product development, manufacturing, and sales for the Rogerson Kratos product lines. Mr. Rogerson continued to report his activity with respect to Rogerson Kratos (i.e., RAC), as well as RC, as nonpassive during the years 2014 to 2016. And Mr. Chang, Mr. Rogerson's tax return preparer, testified with respect to the consolidated RAC activity that "it was pretty clear [Mr. Rogerson] was involved in that business."

There also is no dispute that, for the years 2005 to 2013, the product lines that ultimately were combined into RAEG in 2014 were a significant part of the consolidated RAC activity that Mr. Rogerson characterized as nonpassive. As described above, for purposes of applying the five of ten test, a taxpayer is treated as materially participating in an activity (here, RAEG) during a preceding year if the activity was included in an activity, or substantially overlaps with an activity (here, the aerospace business as a whole), in which the taxpayer materially participated for the preceding year. Treas. Reg. § 1.469-5(j)(1).

There can be no question there is substantial overlap between RAEG's activities in 2014 and later years and the activities of the overall aerospace business before 2014. Documentary evidence and the testimony of multiple witnesses confirms that the products, employees, and customers of the Rogerson companies were generally the same before and after the 2014 reorganization. In other words, the business activities that became part of RAEG were the same before and after the reorganization, but organized differently. And each of the RAEG product lines had been part of the RAC consolidated activity since long before the relevant ten-year period. As Mr. Rogerson states in his opening brief: "[T]he RAEG Activity that commenced in 2014 is really the compilation and consolidation of multiple product lines from various

**[*21]** entities that had been conducted on a historical basis." Pet'r's Simultaneous Opening Br. 73.

In light of these facts and the applicable regulations, we conclude that, in 2014, 2015, and 2016, Mr. Rogerson's RAEG activity substantially overlapped with an activity (i.e., the aerospace business as a whole) that he materially participated in from at least 2005 to 2013. Under Treasury Regulation § 1.469-5(j)(1), therefore, the five of ten test has been met for each of 2014, 2015, and 2016, and Mr. Rogerson is treated as materially participating in RAEG for those years. *See also* Temp. Treas. Reg. § 1.469-5T(a)(5) (setting forth the five of ten test).

### 3. *Mr. Rogerson's Counterarguments*

Mr. Rogerson makes three primary arguments regarding the five of ten test: (1) the test is a new matter not properly before the Court, (2) the regulation containing the test is substantively and procedurally invalid, and (3) even if it does apply, the test does not require that Mr. Rogerson be treated as materially participating in RAEG. As we explain below, none of these arguments changes our conclusion.

### a. *New Matter*

To begin with, Mr. Rogerson argues that the five of ten test is a new matter not pleaded by the Commissioner. Therefore, Mr. Rogerson contends, the matter is not properly before the Court or, in the alternative, the Commissioner bears the burden of proof.[21] *See Shea v. Commissioner*, 112 T.C. 183, 191 (1999). This argument borders on frivolous.[22]

---

[21] Mr. Rogerson also contends that the Commissioner bears the burden of proof with respect to certain other arguments raised by the Commissioner. Because we resolve this case without reaching those arguments, we need not address Mr. Rogerson's further contentions.

[22] As one component of the argument, Mr. Rogerson characterizes the five of ten test as an "estoppel" theory. Pet'r's Simultaneous Suppl. Br. 8. But Mr. Rogerson's characterization demonstrates a misunderstanding of the rule. The five of ten test does not estop anyone from doing anything. Rather it provides guidance on how the statutory material participation test applies when either a relevant activity or a taxpayer's participation in a relevant activity changes over time. And Treasury Regulation § 1.469-5(j)(1) provides more specific guidance on the application of the five of ten test. As Mr. Rogerson notes, it is a "Definitional Reg." Pet'r's Simultaneous Suppl. Br. 2.

[*22] The Commissioner is considered to have raised a new matter when the theory or basis upon which he relies was not stated in the notice of deficiency and the new theory or basis requires the presentation of different evidence. *Id.* at 197. But a new theory that merely clarifies or develops the original determination is not a new matter in respect of which the Commissioner bears the burden of proof. *Id.* at 191 (citing *Wayne Bolt & Nut Co. v. Commissioner*, 93 T.C. 500, 507 (1989)).

The notice of deficiency in this case stated that Mr. Rogerson's income from RAEG should be treated as nonpassive because he "materially participated in RAEG." Consistent with the notice, the Pretrial Memoranda of each party reflects an understanding that the nature of Mr. Rogerson's participation in RAEG would be addressed at trial.

As already discussed, the five of ten test is one of the seven regulatory tests for determining whether a taxpayer materially participated in an activity. *See* discussion in Opinion Part II.B.1 above. Indeed, Mr. Rogerson's own Pretrial Memorandum explained that the applicable regulations include "seven tests to determine whether a taxpayer has materially participated."[23] Pet'r's Pretrial Mem. 6. We therefore have no trouble concluding that the Commissioner's reliance on the five of ten test is a clarification or development of his original determination and not a new matter. *See Estate of Abraham v. Commissioner*, 408 F.3d 26, 36 (1st Cir. 2005) (stating there is no requirement that a notice of deficiency be as detailed as a trial brief), *aff'g* T.C. Memo. 2004-39, *amended* 429 F.3d 294 (1st Cir. 2005); *Ax v. Commissioner*, 146 T.C. 153, 170–71 (2016) (construing a notice of deficiency with "reasonable breadth" to conclude that it encompassed assertions later made by the Commissioner).[24] Nor do we perceive any surprise or prejudice to Mr. Rogerson where the Commissioner has consistently maintained—in his notice of deficiency, Answer, and

---

[23] The Pretrial Memorandum also claimed that only three of the tests were relevant to this case, not including the five of ten test. But that statement simply represents Mr. Rogerson's view of the case and, of course, is not binding on the Commissioner or the Court.

[24] In *Ax*, we also cited the following statement from *Abatti v. Commissioner*, 644 F.2d 1385, 1390 (9th Cir. 1981), *rev'g* T.C. Memo. 1978-392: "[I]f a deficiency notice is broadly worded and the Commissioner later advances a theory not inconsistent with that language, the theory does not constitute new matter, and the burden of proof remains with the taxpayer." *Ax*, 146 T.C. at 171 n.18.

**[\*23]** Pretrial Memorandum—that Mr. Rogerson materially participated in RAEG.

In summary, we conclude the five of ten test is properly before this Court. And, although we do not decide this issue based on the burden of proof, the burden with respect to the five of ten test remains with Mr. Rogerson.

b. *Regulation Validity*

Mr. Rogerson also contends, for the first time in his Supplemental Briefing, that the five of ten test is an invalid rule, both substantively and procedurally. We address these arguments in turn.

i. *Substantive Validity*

Mr. Rogerson argues that the five of ten test is substantively invalid because it contradicts section 469. Specifically, Mr. Rogerson contends that material participation exists under the statute only to the extent that a taxpayer's involvement in an activity is regular, continuous, and substantial during the year under consideration, citing section 469(h). Because the five of ten test analyzes taxpayer participation in an activity during prior years for purposes of determining participation in the current year, Mr. Rogerson views the test as contrary to the statute. We disagree.

Contrary to Mr. Rogerson's assertion, section 469 does not mandate the consideration of only present-year activity in determining material participation. Rather, section 469(h)(1) provides that "[a] taxpayer shall be treated as materially participating in an activity only if the taxpayer is involved in the operations of the activity on a basis which is—(A) regular, (B) continuous, and (C) substantial." Nothing in the section addresses the timing of the taxpayer's involvement. Further, the statute dictates that "[t]he Secretary shall prescribe such regulations as may be necessary or appropriate to carry out provisions of this section, including regulations [that] specify what constitutes . . . material participation . . . for purposes of this section." I.R.C. § 469(*l*)(1). In other words, the statute is silent on the relevant period for assessing

**[\*24]** a taxpayer's involvement and directs the Secretary to fill in any gaps via regulation.[25]

In light of these provisions, we easily conclude that the five of ten is not contrary to section 469 and that the authorities Mr. Rogerson cites are inapplicable.[26]

ii.     *Procedural Validity*

Next, Mr. Rogerson argues that the five of ten test is procedurally invalid because the temporary regulation in which it appears was enacted in violation of the notice and comment requirements of the Administrative Procedure Act (APA). *See* 5 U.S.C. § 553(b) and (c). Specifically, Mr. Rogerson observes that the five of ten test appears in Temporary Treasury Regulation § 1.469-5T, which was issued in 1988 without notice and comment. As described in Opinion Part II.B.1 above, certain parts of the original package were amended in 1989 and finalized in 1992, including Treasury Regulation § 1.469-5(j)(1). But the seven tests for material participation remain in their original temporary form.

Mr. Rogerson's argument raises an interesting issue that has been analyzed by judges and legal scholars. *See, e.g.*, *Intermountain Ins. Serv. of Vail, LLC v. Commissioner*, 134 T.C. 211, 238–48 (2010) (Halpern & Holmes, JJ., concurring), *supplementing* T.C. Memo. 2009-195, *rev'd and remanded on other grounds*, 650 F.3d 691 (D.C. Cir. 2011), *vacated and remanded*, 566 U.S. 972 (2012); Eleanor D. Wood, Note, *Rejecting Tax Exceptionalism: Bringing Temporary Treasury Regulations Back in Line With the APA*, 100 Minn. L. Rev. 839 (2015)

---

[25] The provisions Mr. Rogerson cites—section 469(a)(1), (c)(1), and (f)—do not support a different conclusion. In relevant part, section 469(a)(1) simply states that passive activity losses are disallowed "for the taxable year," and section 469(c)(1) provides that a passive activity is any activity in which a taxpayer does not materially participate. That section 469 specifies the year in which the loss is disallowed says nothing about the timeframe for assessing a taxpayer's participation in an activity. Nor does the special rule for carryover losses from a former passive activity in section 469(f)—an issue that is irrelevant in the case of a former *nonpassive* activity—preclude Treasury from issuing other rules for taxpayers who change their participation levels over time.

[26] The determination that the five of ten test is not contrary to section 469 also resolves Mr. Rogerson's argument that the five of ten test is unconstitutional, because that argument is premised on the existence of a direct conflict between the statute and the regulation. Additionally, because this conclusion fully addresses Mr. Rogerson's arguments, we need not decide on the appropriate standard of review for temporary Treasury regulations such as those at issue here.

**[\*25]** (collecting authorities); *cf. Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1148 (6th Cir. 2022) ("Because the IRS's process for issuing Notice 2007-83 did not satisfy the notice-and-comment procedures for promulgating legislative rules under the APA, we must set it aside."). We need not resolve this issue, however, because it does not change the result in Mr. Rogerson's case, as described below.

For purposes of this discussion, we will assume (only for the sake of analysis) that Mr. Rogerson is correct and that the five of ten test is a procedurally invalid regulation that cannot be applied here. Because Mr. Rogerson's challenge to the regulation is that it was issued without first being subject to notice and comment, accepting his theory would mean that other temporary regulations issued as part of the same package would also be invalid. This would include all seven regulatory tests for determining material participation and the related rules in Temporary Treasury Regulation § 1.469-5T.

Assuming solely for the sake of analysis that (as Mr. Rogerson argues) the seven regulatory tests for material participation would need to be disregarded, we would be left with the general statutory rule of section 469(h) to determine whether Mr. Rogerson materially participated in RAEG during 2014, 2015, and 2016. As noted above, that provision states as follows: "A taxpayer shall be treated as materially participating in an activity only if the taxpayer is involved in the operations of the activity on a basis which is—(A) regular, (B) continuous, and (C) substantial."[27] Based on the record before us, we are convinced that Mr. Rogerson's involvement in RAEG satisfied this standard for 2014, 2015, and 2016.[28]

---

[27] One of the seven regulatory tests is similar to the statutory rule, but with some additional limitations related to the number of hours required and the types of hours that qualify. *See* Temp. Treas. Reg. § 1.469-5T(a)(7), (b)(2), (f)(2); *see also Mordkin v. Commissioner*, T.C. Memo. 1996-187, slip op. at 24, 45–48 (describing limiting rules). The effect of these rules is to limit a taxpayer's ability to qualify as materially participating, which in this case could help Mr. Rogerson. But if one accepts the premise of Mr. Rogerson's argument that Temporary Treasury Regulation § 1.469-5T(a)(5) is procedurally invalid, then the other portions of the regulation would also need to be ignored and therefore would not afford him any protection.

[28] This conclusion is consistent with Treasury Regulation § 1.469-5(f)(1), which was finalized in 1992 and states that

> any work done by an individual (without regard to the capacity in which the individual does the work) in connection with an activity in

**[\*26]** Mr. Rogerson was a hands-on CEO during the years at issue. No major decisions could be made without his input, and no detail was too small for his attention. For example, Mr. Rogerson weighed in on accounting and financial reporting minutiae, interacted directly with company employees, and line-edited company documents, such as offer letters and press releases. Top RAEG executives reached out to him for permission to undertake routine actions, such as responding to customer inquiries or providing small bonuses or raises to company employees. On one occasion, RAEG's president sought approval from Mr. Rogerson to offer an employee a raise of $0.50 per hour. On other occasions, executives confirmed that Mr. Rogerson's direct involvement, whether in the form of "ongoing and specific directives," "edict[s]," or other directions, would be required to get things done.

Mr. Rogerson's involvement in sales and customer relations further belies any assertion that he was not substantially involved in RAEG's operations. Mr. Rogerson traveled to meet with RAEG customers, including on one occasion to Indonesia. He also met with RAEG customers at RAEG's offices. Indeed, the record reflects more than one instance in which Mr. Rogerson told RAEG executives that he would resolve a problem by meeting personally with the customer involved. Customers sometimes reached out to Mr. Rogerson directly to discuss issues, and Mr. Rogerson was involved in multiround negotiations with customers on pricing and other matters. He also approved any bid provided to a customer with an aggregate value over $100,000; in one month in 2016, that approval was requested at least a dozen times.

In the face of a record demonstrating that he spoke and emailed with executives regularly on RAEG matters, Mr. Rogerson asserts that most of these interactions took only minutes of his time. Even assuming that to be the case, however, Mr. Rogerson's ability to respond to detailed inquiries so quickly shows his detailed knowledge of every aspect of the business. Indeed, many of Mr. Rogerson's communications reflect first-hand experience with RAEG's employees, customers, and products that extends far beyond what could have been acquired by a passive investor.

---

which the individual owns an interest at the time the work is done shall be treated for purposes of this section as participation of the individual in the activity.

**[\*27]** To summarize, Mr. Rogerson would not prevail even if he were correct about the procedural validity of the five of ten test, because we find that he was regularly, continuously, and substantially involved in the operations of RAEG during 2014, 2015, and 2016 within the meaning of section 469(h). Accordingly, we need not decide whether the five of ten test is procedurally valid and turn instead to Mr. Rogerson's final argument.

### c. *Application of the Five of Ten Test*

Mr. Rogerson argues that even if the five of ten test is valid and potentially applicable here, he should still prevail. Specifically, Mr. Rogerson asserts that applying the rules defining an "activity" for purposes of section 469 to the RAEG product lines before and after the 2014 reorganization results in two possible alternatives. First, RAEG could be viewed as an entirely new activity following the 2014 reorganization, with the result that there are no prior years of involvement for purposes of applying the five of ten test. Second, if a comparison of Mr. Rogerson's involvement in the RAEG activities before and after 2014 is required despite the 2014 reorganization, Mr. Rogerson contends that the five of ten test still does not apply because his involvement in the RAEG product lines was passive even before 2014. We take these arguments in turn.

### i. *New Activity Argument*

Treasury Regulation § 1.469-4(c)(1) discusses the concept of an "activity" for purposes of section 469 and provides as follows: "One or more trade or business activities or rental activities may be treated as a single activity if the activities constitute an appropriate economic unit for the measurement of gain or loss for purposes of section 469." If a taxpayer decides based on all the facts and circumstances that multiple activities constitute a single economic unit and therefore may be treated as a single activity, the regulations refer to that determination as "grouping." *See* Treas. Reg. § 1.469-4(c)(2).

In support of his first proposed alternative—i.e., that for purposes of the five of ten test, RAEG did not exist as activity before 2014—Mr. Rogerson states as follows:

> It is clear that the Rogerson companies did not actually segregate [R]AEG as a separate "activity" before 2014. No position was taken on any RAC return before 2014 reflecting anything other than a single activity.

**[\*28]**  [Mr.] Chang clearly believed no such determination was appropriate because everything related to the Rogerson companies was reported on a single RAC return.

Pet'r's Simultaneous Suppl. Br. 25.  Accordingly, Mr. Rogerson appears to contend that before the 2014 reorganization, the aerospace business as a whole (as reflected on RAC's returns) was the relevant activity under the regulations and that RAEG should therefore be treated as a new activity for 2014, 2015, and 2016.  If RAEG was a new activity starting in 2014, Mr. Rogerson further contends, then the five of ten test cannot apply, because Mr. Rogerson would have no history of involvement in the activity.

Mr. Rogerson's argument is foreclosed by Treasury Regulation § 1.469-5(j)(1).  As discussed in detail in Opinion Part II.B.1 above, that rule does not require the taxpayer's precise activity to have existed in prior years for purposes of applying the five of ten test.  Indeed, the entire point of the rule is to address situations in which circumstances change over time.  The rule applies as long as the taxpayer's current-year activity (here, RAEG) "includes significant section 469 activities" (here, the RAEG product lines or RAEG as a whole) "that are substantially the same as significant section 469 activities there were included in [a preceding-year activity] in which the taxpayer materially participated" (here, the aerospace business as a whole).  In other words, all that is required is substantial overlap between the current and preceding-year activities.  The record here leaves no doubt that the activity conducted by RAEG in 2014, 2015, and 2016 overlaps substantially with the "single activity" reflected on RAC's prior returns—i.e., the aerospace business as a whole.

ii. *Passive Activity Argument*

Mr. Rogerson's second alternative—that his involvement in the RAEG product lines was passive even before 2014—faces a factual problem.  There is no question that before 2014 Mr. Rogerson's involvement in the aerospace business as a whole was nonpassive. Similarly, there is no dispute that Mr. Rogerson reported his involvement in the aerospace business as a whole, including the activities that became part of RAEG, as nonpassive.  In light of Treasury Regulation § 1.469-5(j)(1), these facts are sufficient to satisfy the five of ten test with respect to RAEG in 2014, 2015, and 2016.

**[\*29]** In an attempt to escape the implications of his prior reporting, Mr. Rogerson contends that neither he nor RAC ever made an affirmative decision to group the RAEG product lines with his other aerospace activities. According to Mr. Rogerson, RAC's returns made no effort to indicate whether they reported "one activity or many activities, grouped or not." Pet'r's Simultaneous Answering Br. 34. The implication seems to be that, if the product lines that became part of RAEG were not formally grouped with RAC in prior years, then Mr. Rogerson's reporting and activity with respect to RAC as a whole would be irrelevant in applying the five of ten test to the RAEG product lines in subsequent years. But Mr. Rogerson is incorrect.

The regulations Mr. Rogerson cites required RAC to perform a grouping analysis for the years before 2014. *See* Treas. Reg. § 1.469-4(d)(5)(i) ("[A]n S corporation . . . must group its activities under the rules of this section."). Mr. Rogerson concedes that, before 2014, RAC reported the consolidated results of the entire aerospace business without differentiation.[29] This approach indicates that RAC treated the aerospace business as a single activity (or as multiple activities grouped into a single activity) for purposes of section 469. Mr. Rogerson concedes as much, stating: "No position was taken on any RAC return before 2014 reflecting anything other than a single activity." Pet'r's Simultaneous Suppl. Br. 25. And Mr. Rogerson was not free to distinguish between his various aerospace activities for purposes of section 469 for any year in which RAC combined them. *See* Treas. Reg. § 1.469-4(d)(5)(i) (providing that a shareholder of an S corporation may not treat activities grouped together by his corporation as separate activities). Accordingly, RAC's treatment of the aerospace business as a single activity before 2014 required Mr. Rogerson to take the same approach. He did so and determined that his involvement in the overall business was active. The five of ten test requires nothing more.

---

[29] Mr. Rogerson cites *Hardy v. Commissioner*, T.C. Memo. 2017-16, in which our Court concluded that taxpayers who merely report an S corporation's activity as nonpassive do not thereby group that activity with their other nonpassive activity. But that case considered whether activity reported on a Schedule K-1 had been grouped with other activity not reported on the Schedule K-1; it did not consider whether undifferentiated amounts reported on a single Schedule K-1 had been grouped together. *Id.* at \*15–16. Additionally, *Hardy* analyzed only the grouping regulations under Treasury Regulation § 1.469-4 and did not consider the five of ten test.

**[\*30]** Having addressed Mr. Rogerson's involvement with RAEG, we next turn to the proper characterization under section 469 of Mr. Rogerson's yacht activities for 2014, 2015, and 2016.

### C. *Rental Rules and the Yacht Activities*

#### 1. *Rental Activities*

As noted above, rental activities are passive regardless of a taxpayer's participation, subject to certain exceptions. *See* I.R.C. § 469(c)(2), (4), (7).[30] A rental activity is "any activity where payments are principally for the use of tangible property." I.R.C. § 469(j)(8); *see also* Temp. Treas. Reg. § 1.469-1T(e)(3)(i) (stating that an activity is a rental activity if during the taxable year tangible property held in connection with the activity is used by customers or held for use by customers and gross income (or expected gross income) attributable to the activity represents amounts paid or to be paid principally for the use of the tangible property).

Neither of Mr. Rogerson's yachts (the *TOTO* and the *Falcon Lair*) was chartered during 2014, 2015, or 2016, but the parties agree that Mr. Rogerson intended to charter the yachts. Accordingly, the yachts were tangible property held for use by customers, and any income from the yacht activities would have represented amounts paid principally for the use of the tangible property. The yacht activities therefore were rental activities unless an exception applies.[31] *See* I.R.C. § 469(j)(8); Temp. Treas. Reg. § 1.469-1T(e)(3)(i).

#### 2. *Exceptions to Rental Activity*

The regulations provide six exceptions to the definition of "rental activity," two of which are relevant to our analysis. Specifically, an activity involving the use of tangible property is not a rental activity if for the taxable year—(1) the average period of customer use for the

---

[30] *See also*, *e.g.*, *Kessler v. Commissioner*, T.C. Memo. 2003-185; *Tarakci v. Commissioner*, T.C. Memo. 2000-358; *Frank v. Commissioner*, T.C. Memo. 1996-177.

[31] The Commissioner argues that, for purposes of analyzing the yacht activities, the *TOTO* should be viewed as a separate activity from the *Falcon Lair* and that each of the entities through which Mr. Rogerson held and operated the *Falcon Lair* (Platinum and Sterling) also should be analyzed separately. By contrast, Mr. Rogerson argues that all his yacht activities should be treated as a single activity. Because our conclusion would be the same regardless of how the yacht activities are grouped, we need not resolve this issue.

**[\*31]** property is seven days or less; or (2) the average period of customer use for such property is 30 days or less, and significant personal services are provided by or on behalf of the owner of the property in connection with making the property available for use by customers. Temp. Treas. Reg. § 1.469-1T(e)(3)(ii)(A) and (B).

For purposes of these rules, a period of customer use is the period "during which a customer has a continuous or recurring right to use" the property. Treas. Reg. § 1.469-1(e)(3)(iii)(D). The average period of customer use is calculated by dividing the aggregate number of days in all periods of customer use of the property by the number of periods of customer use. *Id.* subdiv. (iii)(C).[32] And finally, to determine whether services are significant personal services, all of the relevant facts and circumstances are considered, including the frequency with which the services are provided, the type and amount of labor required to perform the services, and the value of the services relative to the amount charged for the use of the property. Temp. Treas. Reg. § 1.469-1T(e)(3)(iv)(A).

Mr. Rogerson claims that his yacht activities qualify for both exceptions. We disagree.

a. *Seven Days or Less Exception*

As to the first exception, Mr. Rogerson has not requested any findings of fact or provided any evidence to allow us to conclude that his yacht activities involved charters of seven days or less during the years at issue or any other year. Mr. Rogerson claims that "[n]either TOTO nor Falcon Lair was available to be 'rented' for weeks at a time" and that "the Yacht Charter Activity was intended to provide short-term use for day trips and other short-term excursions." Pet'r's Simultaneous Opening Br. 78. But regardless of these plans, no customers chartered the yachts during 2014, 2015, or 2016. And unlike the affirmative rule for defining a rental activity, which considers a taxpayer's intended or expected use of property, the exceptions to that rule turn on what actually happened during the taxable year. *Compare* Temp. Treas. Reg. § 1.469-1T(e)(3)(i) (allowing consideration of potential customer use and expected income in identifying a rental activity), *with id.* subdiv. (ii)(A) and (B) (establishing exceptions based on the "average period of customer use"), *and* Treas. Reg. § 1.469-1(e)(3)(iii)(C) and (D)

---

[32] The rules are slightly more nuanced with respect to activities involving multiple classes of property, but those nuances are irrelevant for purposes of our analysis. *See* Treas. Reg. § 1.469-1(e)(3)(iii)(A) and (B).

**[\*32]** (calculating the average period of customer use based on actual customer activity). Without any customer use, it is impossible to establish (as required by the regulations) the average period of customer use for the yachts. Accordingly, Mr. Rogerson fails to qualify for the first exception.[33]

### b. *30-day Exception*

Mr. Rogerson's argument for the second exception falls short for the same reason. A claim in Mr. Rogerson's brief that "[n]o charter would have been for more than 30 days," Pet'r's Simultaneous Opening Br. 79, is not evidence, and again, the absence of any actual customer use of the yachts precludes us from determining that the average period of customer use was 30 days or less. Similarly, the fact that the *TOTO* and the *Falcon Lair* each had crews that conceivably could have provided services does not establish that significant personal services were in fact provided to customers. *See* Temp. Treas. Reg. § 1.469-1T(e)(3)(ii). Mr. Rogerson has requested no findings of fact nor produced any evidence about the kinds of services that crew members could or would provide to customers. And, more to the point, we know that no services were provided during the years at issue because the yachts were not chartered.

Mr. Rogerson has failed to establish that his yacht activities qualify under the exceptions provided in the temporary regulations. The activities therefore constituted rental activities and were per se passive during the years at issue.[34] *See* I.R.C. § 469(c)(2), (4), (j)(8); Temp. Treas. Reg. § 1.469-1T(e)(3)(i).[35]

---

[33] We express no view as to the outcome of a case in which the evidence demonstrates that one or more of the exceptions under Temporary Treasury Regulation § 1.469-1T(e)(3)(ii) had been met in prior years, but not during the years at issue. This case does not present such a scenario.

[34] Mr. Rogerson's argument that he materially participated in the yacht activity would not change this conclusion, because rental activities are considered passive without regard to the taxpayer's level of participation. I.R.C. § 469(c)(2), (4). We therefore need not address it further.

[35] On January 12, 2021, just over two months before the trial of this case was scheduled to begin in March, the Commissioner filed a Motion for Leave to File an Amendment to Answer to further allege under section 183 that Mr. Rogerson did not engage in his yacht activities with an objective of realizing a profit. Mr. Rogerson objected on the ground that permitting the amendment would prejudice his preparation for trial. He further argued that the amendment came too late and

**[\*33]** III.   *Accuracy-Related Penalties*

Lastly we must determine whether the section 6662 penalties the Commissioner determined in the notice of deficiency properly apply.

The Commissioner bears the burden of production with respect to an individual taxpayer's liability for a penalty and is required to present sufficient evidence showing that the penalty is appropriate. I.R.C. § 7491(c); *Higbee v. Commissioner*, 116 T.C. 438, 446–47 (2001). To meet this burden for a penalty under section 6662(a), the Commissioner must show that he complied with the procedural requirements of section 6751(b)(1). *See* I.R.C. § 7491(c); *Frost v. Commissioner*, 154 T.C. 23, 34 (2020). Once the Commissioner satisfies his burden of production, the taxpayer bears the burden of proving that the Commissioner's penalty determination is incorrect or that the taxpayer has an affirmative defense such as reasonable cause. *See* Rule 142(a); *Higbee*, 116 T.C. at 446–47.

Because we conclude that Mr. Rogerson had reasonable cause and relied in good faith on his adviser Mr. Chang in connection with the preparation of the 2014 to 2016 returns, we conclude that the penalties do not apply.

A.   *Section 6662(a) Penalty*

Section 6662(a) and (b)(1) and (2) imposes a penalty equal to 20% of the portion of an underpayment of tax required to be shown on a taxpayer's return that is attributable to "[n]egligence or disregard of

---

essentially was designed to permit the Commissioner a "do-over" after the period for discovery had already run. After holding a status conference with the parties, the Court advised them that it intended to deny the Motion. The Court observed that permitting amendment would not be in the interest of justice in light of the procedural posture of the case, the timing of the request after the close of discovery, and the prejudice to Mr. Rogerson in preparing for trial on the existing issues, while at the same time being required to prepare for trial a different issue that turned on much different evidence. The Court also noted that the notice of deficiency specifically highlighted the issue sought to be challenged in the proposed amendment, while observing that the Commissioner had decided not to raise the issue in light of a prior resolution by IRS Appeals. The Court also advised the parties that the Motion would be formally addressed in any opinion issued in the case. Trial of this case was later postponed from March to May at the parties' request. Upon further consideration, for the reasons noted above, we will deny the Commissioner's Motion. *See Waterman v. Commissioner*, 91 T.C. 344, 349–51 (1988) (leave to amend may be denied upon a showing of prejudice to the petitioner); *Law v. Commissioner*, 84 T.C. 985, 990 (1985) (whether leave will be granted is a question falling within the discretion of the Court).

**[\*34]** rules or regulations" and/or a "substantial understatement of income tax." Negligence includes "any failure to make a reasonable attempt to comply with the provisions of this title." I.R.C. § 6662(c). An understatement of income tax is a "substantial understatement" if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. I.R.C. § 6662(d)(1)(A). The Commissioner here has asserted section 6662(a) penalties on the basis of both negligence and substantial understatement.

B.     *Reasonable Cause and Good Faith*

A taxpayer may avoid a section 6662(a) penalty by showing that there was reasonable cause for the underpayment and that the taxpayer acted in good faith. I.R.C. § 6664(c)(1). The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all of the pertinent facts and circumstances, including the taxpayer's efforts to assess the proper tax liability and the taxpayer's knowledge, experience, and education. Treas. Reg. § 1.6664-4(b)(1).

Mr. Rogerson contends, among other things, that he had reasonable cause for the position he took on his tax returns because he reasonably relied on Mr. Chang's advice.[36] Reasonable reliance on professional advice may constitute reasonable cause and good faith if the taxpayer proves, by a preponderance of the evidence, that (1) the adviser was a competent professional with sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment. *See Alt. Health Care Advocates v. Commissioner*, 151 T.C. 225, 246 (2018); *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002); *see also Charlotte's Office Boutique, Inc. v. Commissioner*, 425 F.3d 1203, 1212 n.8 (9th Cir. 2005) (quoting the three-pronged test with approval), *aff'g* T.C. Memo. 2004-43 *and* 121 T.C. 89 (2003).

---

[36] One of Mr. Rogerson's alternative arguments is that the penalties were not timely approved under section 6751(b). The U.S. Court of Appeals for the Ninth Circuit recently considered this question in the context of an assessable penalty under section 6707A, which, as the Ninth Circuit noted, is not subject to the Code's deficiency procedures. *See Laidlaw's Harley Davidson Sales, Inc. v. Commissioner*, 29 F.4th 1066, 1071 (9th Cir. 2022), *rev'g and remanding* 154 T.C. 68 (2020). In light of our determination that Mr. Rogerson is not liable for the section 6662(a) penalties, we need not consider the penalty approval issue.

**[*35]**     1.     *Competent Tax Adviser*

There is no precise threshold of competence that a tax adviser must have to justify a taxpayer's reliance. Rather, our practical test looks for expertise in the context of the facts of each case. *CNT Inv'rs, LLC v. Commissioner*, 144 T.C. 161, 224 (2015); *see also 106 Ltd. v. Commissioner*, 136 T.C. 67, 77 (2011) (finding the taxpayer's longtime attorney and accounting firm, who "would have appeared competent to a layman," and especially so to the taxpayer, had adequate expertise), *aff'd*, 684 F.3d 84 (D.C. Cir. 2012); *Neonatology Assocs., P.A.*, 115 T.C. at 99 (holding that an insurance agent who did not claim to be a tax professional and had a direct financial interest in the transaction at issue lacked sufficient expertise to advise on the tax consequences of complex life insurance transactions).

Applying this practical test, we find that Mr. Chang was a competent tax adviser with sufficient expertise to justify reliance. Mr. Chang was a professionally licensed and experienced tax return preparer with his own practice. He knew Mr. Rogerson's personal and business affairs from his long relationship with Mr. Rogerson and his companies. There is no indication in the record that Mr. Rogerson had any reason to doubt Mr. Chang's competence to provide the advice he sought.

2.     *Provision of Information*

To meet the second requirement of reasonable reliance, the taxpayer must provide necessary and accurate information to the adviser. *See Alt. Health Care Advocates*, 151 T.C. at 246. Additionally, the taxpayer cannot "fail[] to disclose a fact that [he] knows, or reasonably should know, to be relevant to the proper tax treatment of an item." Treas. Reg. § 1.6664-4(c)(1)(i). But a taxpayer is not obligated to share details that a reasonably prudent taxpayer would not know, or that he neither would know nor reasonably should know are relevant. *CNT Inv'rs, LLC*, 144 T.C. at 228.

We conclude that Mr. Rogerson provided Mr. Chang with necessary and accurate information during their discussions about Mr. Rogerson's activities and the positions taken on Mr. Rogerson's returns. Mr. Chang was Mr. Rogerson's long-time adviser and demonstrated his familiarity with Mr. Rogerson's affairs at trial. Additionally, Mr. Chang and Mr. Rogerson both credibly testified that Mr. Rogerson provided Mr. Chang with information regarding his level of involvement (generally in

**[\*36]** the form of hours estimates) in each of his activities each year for purposes of applying the passive loss rules.[37] And while ultimately we resolve this case on grounds unrelated to the number of hours Mr. Rogerson spent on his various activities during the years at issue, we do not believe that Mr. Rogerson knew or reasonably should have known that factors other than his hours were relevant to the treatment of his activities. *See id.* Mr. Chang, an experienced tax professional, focused his analysis and advice on Mr. Rogerson's activity levels, and Mr. Rogerson had no reason to question that approach. As the Supreme Court has said,

> When an accountant or attorney *advises* a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place. *See Haywood Lumber* [*& Mining Co. v. Commissioner*, 178 F.2d 769, 771 (2d Cir. 1950), *modifying* 12 T.C. 735 (1949)]. "Ordinary business care and prudence" do not demand such actions.

*United States v. Boyle*, 469 U.S. 241, 251 (1985).

### 3.     *Good Faith Reliance on Advice*

The last requirement is that a taxpayer must have actually received advice and relied upon it in good faith. *Neonatology Assocs., P.A.*, 115 T.C. at 99. Advice is "any communication, including the opinion of a professional tax advisor, setting forth the analysis or conclusion of a person, other than the taxpayer, provided to (or for the

---

[37] The Commissioner argues that Mr. Rogerson's failure to keep logs of his hours was negligent, but the Commissioner's own regulations state that logs are not required. *See* Temp. Treas. Reg. § 1.469-5T(f)(4). Moreover, as the extensive discussion in Opinion Part II demonstrates, we do not resolve this case on the basis of hours Mr. Rogerson spent on each activity during the years at issue. We further note that this Court has found that a taxpayer acted with reasonable cause and good faith when a deficiency is the result of an issue of first impression and the taxpayer's position is reasonably debatable. *See Williams v. Commissioner*, 123 T.C. 144, 153–54 (2004).

**[\*37]** benefit of) the taxpayer and on which the taxpayer relies, directly or indirectly." Treas. Reg. § 1.6664-4(c)(2).

Mr. Chang credibly testified at trial that he provided Mr. Rogerson with advice regarding the proper reporting of his activities under the passive loss rules for 2014, 2015, and 2016 and that Mr. Rogerson's reporting on his personal income tax returns was consistent with that advice. Mr. Rogerson likewise credibly testified that he received advice from Mr. Chang regarding the application of the passive loss rules to his activities and that he followed that advice. We believe their testimony and conclude that Mr. Rogerson reasonably relied on Mr. Chang's advice.

We note that we find credible Mr. Rogerson's reliance upon Mr. Chang's advice in part because Mr. Chang had been preparing Mr. Rogerson's individual returns and the Rogerson companies' returns for over a decade. *See Schwalbach v. Commissioner*, 111 T.C. 215, 230–31 (1998) (finding reasonable reliance where taxpayers consulted their long-time business and tax adviser, he advised them on what he believed was the correct reporting position, and they followed his advice). And Mr. Chang demonstrated his knowledge of the returns and the facts underlying them at trial. That Mr. Rogerson is a well-educated, sophisticated businessman does not preclude him from relying on Mr. Chang, his long-term tax adviser, to advise him regarding technical tax matters and prepare his returns. *See Boyle*, 469 U.S. at 251.

In light of these considerations, taking into account all of the facts and circumstances, we hold that Mr. Rogerson is not liable for the section 6662 accuracy-related penalties.

IV. *Conclusion*

For the reasons described above, we conclude that Mr. Rogerson materially participated in RAEG for the tax years 2014, 2015, and 2016, with the result that income from that activity must be treated as nonpassive in each of those years. We further conclude that Mr. Rogerson's yacht activities during the same years were per se passive as rental activities and therefore that the income associated with those activities must likewise be passive. Finally, we conclude that the penalties the Commissioner determined in the notice of deficiency do not apply.

**[\*38]** To reflect the foregoing,

*An appropriate order will be issued, and decision will be entered under Rule 155.*